# Himrod, Appellant, *v.* Kimberly.

*Statute of limitations—Breach of contract—Acquiescence.*

Where a purchaser of iron ore has full knowledge that the seller cannot and will not deliver the ore and perform his contract, and with such knowledge acquiesces in the breach of the contract for eight years, he is barred by the statute, and cannot thereafter maintain an action to recover damages for the breach.

A party cannot stop the running of the statute of limitations by any arrangement for his own convenience.

The limitation of the statute is not usually to be extended by the negligence of the party who claims to be excused from it. A debt is not saved from it because made payable on demand. A demand will be presumed to have been made in a reasonable time. Acquiescence with knowledge is equivalent to demand and refusal.

Argued Nov. 7, 1907. Appeal, No. 97, Oct. T., 1907, by

plaintiff, from judgment of C. P. Mercer Co., June T., 1901, No. 42, on verdict for defendant in case of Charles Himrod v. P. L. Kimberly, now George Baird, John C. Owsley and Ira B. Bassett, Executors of last will and testament of P. L. Kimberly, deceased. Before FELL, BROWN, MESTREZAT, POTTER and STEWART, JJ. Affirmed.

Assumpsit for breach of contract. Before MILLER, P. J.

The action was based upon a verbal contract.

Facts made in 1892 and afterwards reduced to writing in two letters which passed between the parties, as follows: 

"OCT. 22, 1892.

"MR. P. L. KIMBERLY,

"SHARON, PA.

"Dear Sir :

"As you have not been here, as expected, I write you my understanding of the agreement that we have made. A Company is to be organized to operate the West Duluth Furnace with a capital stock of say $45,000.00. Of this capital stock you and I are each to have one-third. The payment for this stock is to be made by you in iron ore, at price and terms hereinafter mentioned. The stock is to be issued to you or to any person you may designate, and all dividends paid on it to be paid to you until you have received pay for the ore furnished without any charge for interest. When you have received this sum of money the dividends or profits on the one-third of the capital stock taken by us shall be paid to us, and the stock shall belong to us. You are to furnish us with 16,666 tons of ore from the Biwabic mine containing an average of 64 per cent metallic iron when dried to a temperature of 212 Fahrenheit, and to be sufficiently low in phosphorus to make a pig iron with Connelsville coke, containing a maximum of not over .08 in phosphorus. The price to be paid to you for this ore is to be $3.00 per gross ton, delivered on the cars at the furnace. Of this $3.00 there is to be paid by the Furnace Company the freight and a sufficient sum in addition total of $1.00 per gross ton, the remainder $2.00 per gross ton to be applied towards the payment of stock, as heretofore mentioned, until $30,000 shall have been paid.

" Please advise me whether this is your understanding, as we are taking steps to operate the furnace at once.

" Yours truly,

" CHAS. HIMROD."

" Nov. 1, 1892.

" CHAS. HIMROD, ESQ.,

" CHICAGO, ILL.

" Dear Sir:

" In reply to your letter of the 22nd ultimo, my understanding of our conversation in Pittsburg is as stated in your letter. I will agree to furnish you the Ore upon terms stated providing the time of delivery of the Ore is extended until May 1893, if I so desire to extend it until that time, but will deliver the Ore sooner, if the Biwabik Ore Co. are in shape to mine it without any inconvenience to them.

" Yours truly,

" P. L. KIMBERLY."

Himrod was a stockholder in the company that had been operating the West Duluth furnace and still held a lease on it. The furnace was not in operation at the time these letters were written.

About a month after this correspondence the Minnesota Blast Furnace Co. was incorporated, with capital stock of $45,000, all paid in, of which Himrod testified he contributed $30,000. The stock for this contribution was issued to Charles Himrod & Co. This company purchased ore of some of the mines in the neighborhood of the furnace and sold its manufactured products to the West Superior Steel Co. About May 1, 1893, the steel company failed, and by its failure compelled the furnace company also to make an assignment. The latter never resumed business, nor operated its furnace.

Subsequently to the original contract, the following letters passed between the parties.

" Nov. 9, 1892.

" CHARLES HIMROD, ESQ.,

" CHICAGO, ILL.

" Dear Sir:

" In reply to your letter of the 7th inst. I am pleased to know that you met with such good success while in Duluth, in

securing Ore at satisfactory price for operating your furnace with. If you have secured all the Ore that you need to operate the furnace, I would just as soon withdraw, but if you can wait until such time as we are ready to ship the Ore, I will join you, as I wrote you some time ago, but I do not want to issue any paper as you suggest.

"Yours truly,

"P. L. KIMBERLY."

"Nov. 12, 1892.

"MR. P. L. KIMBERLY,

"SHARON, PA.

"Dear Sir :

"I am in respect of yours of the 9th. While we have engaged such ores as we will want until you can mine yours, we will still expect yours as soon as you can supply them, and that the agreement with you will be carried out.

"Yours truly,

"CHAS. HIMROD."

"APRIL 29, 1893.

"MR. P. L. KIMBERLY,

"SHARON, PA.

"Dear Sir:

"According to the terms of our agreement, you were to commence delivering the ore from the Biwabic mine in May. We wish that you would give the proper instructions to ship us about six cars a day of your Standard Bessemer ore to apply on this contract, and notify us how soon we may expect shipments to begin. The ore should be consigned to the Minnesota Blast Furnace Company, West Duluth, Minn.

"Yours truly,

"CHAS. HIMROD."

"MAY 11, 1893.

"MR. P. L. KIMBERLY,

"SHARON, PA.

"Dear Sir:

"On account of the temporary stoppage of the Furnace at West Duluth, we will not want any ore shipped on account of our contract with you. If you desire to ship immediately

advise us, and we will make arrangements to take care of the ore by shipping to Lower Lake ports.

"I have requested Mr. Butler to call and see you, and he will explain the situation to you.

"Yours truly,

"CHAS. HIMROD."

Verdict and judgment for defendant.   Plaintiff appealed.

*Error assigned* was in charging the jury that if they found that suit was not brought within six years from May, 1893, the verdict should be for the defendant.

*S. S. Mehard*, with him *C. B. Mehard*, for appellant.— Kimberly's obligation being not to pay in money, but in iron ore of a specified kind and quality; and the time and place when deliveries of ore were to begin not having been determined, a demand by Himrod and refusal by Kimberly were a condition precedent to Himrod's right of action : Bobdell v. Hopkins, 5 Cowen, 516 ; Bolles v. Stearns, 65 Mass. 320 ; Frazee v. McChord, 1 Ind. 224; Martin v. Chauvin, 7 Mo. 277 ; State v. Mooney, 65 Mo. 494.

As plaintiff's right of action would not accrue until after such demand had been made, the statute of limitations would begin to run only from that time.

The statute of limitations does not begin to run in this state until after the right of action accrues : Overton v. Tracey, 14 S & R. 311; Jones v. Trimble, 3 Rawle, 381; Evans v. See, 23 Pa. 88; Van Horn v. Scott, 28 Pa. 316 ; Girard Bank v. Bank of Penn Township, 39 Pa. 92; Wickersham v. Russell, 51 Pa. 71 ; Finkbone's Appeal, 86 Pa. 368; McGough v. Jamison, 107 Pa. 336 ; Smith v. Bell, 107 Pa. 352 ; Swearingen v. Dairy Co., 198 Pa. 68 ; Cook v. Carpenter, 212 Pa. 165 ; Act of March 27, 1713, sec. 1, 1 Sm. Laws, 76, Stewart's Purdon, 2282.

As an actual demand was necessary in this case to the plaintiff's right of action, and as the statute of limitations would not begin to run until after such right had accrued, the action would not be barred by the statute even though the demand were not made within six years from the date of

the contract: Girard v. Bank of Penn Twp., 39 Pa. 92; Finkbone's Appeal, 86 Pa. 368; McGough v. Jamison, 107 Pa. 336; Smith v. Bell, 107 Pa. 352; Cook v. Carpenter, 212 Pa. 165.

*Q. A. Gordon* and *S. W. Dana,* with them *Templeton, Orr & Whiteman,* for appellees.

OPINION BY MR. JUSTICE POTTER, January 6, 1908:

This action was brought to recover damages for the breach of a contract to deliver iron ore. The contract was set out in the letter of Himrod to Kimberly, dated October 22, 1892, and in the reply from Kimberly, dated November 1, 1892. Under the express terms of the contract, no ore was to be delivered until May, 1893. This was recognized by Himrod in his letter to Kimberly, dated April 29, 1893, in which he wrote: " According to the terms of our agreement you were to commence delivering the ore from the Biwabic Mine in May." The ore was to be delivered at the West Duluth Furnace, and in this letter of April 29, Himrod directs that it be consigned to the Minnesota Blast Furnace Co., West Duluth, Minn. But before any ore had been delivered, the furnace company failed, and the West Duluth furnace ceased to be operated. On May 11, 1893, Himrod wrote Kimberly, " On account of the temporary stoppage of the furnace at West Duluth, we will not want any ore shipped on account of our contract with you." The stoppage of the furnace turned out to be, not temporary, but permanent. But the letter contained the direct statement that no ore was wanted on account of the contract. It is true that Himrod went on to say that if Kimberly desired to ship, he would make arrangements to take care of the ore at lower lake ports. But it was no part of the contract that Kimberly should furnish ore to be used at other places, and the terms of the letter merely make this course optional with Kimberly. Kimberly did not see fit to accept the suggestion to ship ore to other points or to furnish ore to Himrod, notwithstanding the failure of the furnace company, and the stoppage of the plant. It would have been strange had he done so. Why should he ship ore to an insolvent corporation, which had shut down its furnace, and made an assignment for the benefit of

its creditors? There is no suggestion that the furnace company was at that time, or ever afterwards, able to pay the cash portion of the purchase price or that it was ever in condition to use the ore in its furnaces. It would seem that the trial judge might very properly have directed a verdict for defendant on the ground that the evidence showed that the contract was rescinded by the plaintiff. It is argued forcibly by counsel for appellant that a demand was necessary before Kimberly was required to ship the ore, and that a demand and refusal were necessary before Kimberly was liable in damages for breach of the contract. If that be so, the testimony of appellant shows a demand and refusal in 1893, more than six years before suit was brought, leaving out of sight the letter of April 29, 1893, which as the court suggested in its charge, would have been sufficient demand had it not been modified by the later letter of May 11. But Himrod testified that he met Kimberly once or twice in 1893, and gave the substance of the conversation as follows: "I was desirous of, as I explained to him, of having the ore shipped in order that the margin between the cash payment to him and the value of the ore, could be used to pay the debts I had contracted in taking the stock in the furnace. And his reply always was, 'I cannot.'" And then Himrod adds that he concluded that Kimberly was telling the truth when he said he could not ship the ore, and Himrod dropped the matter. But this was plain evidence of demand and refusal at that time. It was not until 1899 or 1900 that Himrod again approached Kimberly on the subject and not then with a demand for delivery of ore, but because as he said, "I wanted him to make good my loss in subscribing for the stock." Kimberly finally refused to pay anything, and afterwards this suit was brought, in which plaintiff claims damages for a breach of contract to ship iron ore. There was no contract to indemnify plaintiff against loss on the stock, and the only way in which the fact of loss in that respect could be material here, would be as evidence of the amount of damages sustained by the alleged failure to furnish ore. The testimony of the plaintiff, that in 1893 the defendant said repeatedly that he could not ship any ore under the contract, seems to us to demonstrate that whatever breach of contract there was, in this case, was complete in the

year 1893, under every aspect in which the evidence can be viewed.

But the ground upon which the trial judge rested his instructions to the jury, was that granting there was a breach of the contract, it occurred more than six years before suit, and the bar of the statute of limitations had intervened. We think the point was well taken. The contract was to furnish ore or to begin furnishing in May, 1893. Unless there was legal excuse, Kimberly broke the contract when he failed to furnish ore in that month. But even by plaintiff's story Kimberly was not at fault in failing to deliver then, and it is settled law in Pennsylvania that a party cannot stop the running of the statute of limitations by any arrangement for his own convenience: Steele's Administrators v. Steele, 25 Pa. 154.

In Waterman v. Brown, 31 Pa. 161, Chief Justice Lowrie said (p. 165): " The limitation of the statute is not usually to be extended by the negligence of the party who claims to be excused from it. A debt is not saved from it because made payable on demand. It is often said that, where a demand is necessary to the right of action, the statute does not begin to run till the demand is made. But this almost sets aside the statute in such cases, and hence it is decided, that a demand will be presumed to have been made in a reasonable time."

In Barnes v. Hardware Co., 203 Pa. 570, defendant gave a note for the purchase money of real estate, payable in six months, and containing the following clause: " Provided all liens not assumed in the purchase of the warehouse property from the said Pickett and Company, are then paid, or removed, and if not then so removed, payment is to be made as and when they are removed." It was held that the statute began to run as against the entire note at the end of the six months, notwithstanding the fact that the liens referred to in the proviso had not all been paid and removed at that time. The present chief justice said (p. 573): " The disability to sue until the liens were removed was not a privilege of the payee to delay its running, but an obligation precedent to suit by him, a disability of his own making, removable at any time by his own act."

Acquiescence, with knowledge, is equivalent to demand and refusal: Mifflin County Nat. Bank v. Bank, 199 Pa. 459. In

this case there was during the period from 1893 to 1901 admitted knowledge on the part of plaintiff, that defendant could not, or would not, make delivery of the ore as provided in the original contract. This determination was known and acquiesced in, without any attempt to enforce the agreement, until the bringing of this suit. The delay was too great. The bar of the statute of limitations had intervened. The assignments of error are overruled and the judgment is affirmed.