## Heimpel et ux. *v.* First National Bank and Trust Company of Bethlehem, Appellant.

Argued January 30, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*M. B. Riskin,* of *Taylor, Schrader & Riskin,* for appellant.

*Russell C. Mauch,* of *Mauch & Goodman,* for appellees.

OPINION BY MR. JUSTICE MAXEY, March 25, 1940:

Plaintiffs below, husband and wife, respectively, brought an action in trespass against the appellant bank, for damages by reason of the bank's alleged wrongful conversion of certain securities deposited by them with the bank as collateral for a loan. They obtained a verdict for $2,619.93. The court below refused to enter judgment n. o. v. This appeal followed.

On October 19, 1937, the bank held two notes of plaintiffs', one was a demand note for $1,200 with interest from its date, July 23, 1937. No demand for payment was made prior to October 19th and no interest was then due. The other note was dated September 27, 1937, in the amount of $6,055, payable thirty days after date. Therefore, on October 19, 1937, neither note was in default. As collateral to secure payment the bank held 568 shares of Imperial Oil Co., Ltd., stock and 3 shares of Pure Oil Company common stock belonging to plaintiffs. Each note contained an identical agreement by the makers providing for calls by the payee for additional collateral and sale of the collateral deposited, "upon default." The language used was as follows: "upon default of payment at maturity, whether such maturity occurs by expiration of time or default in depositing additional security as above agreed, do hereby authorize and empower the holders hereof, for the purpose of liquidation of this note and of all interests and costs thereon, to sell, transfer and deliver the whole or any part of such security, or any additions thereto, or substitute therefor, without any previous demand, advertisement or notice, either at brokers' board or public or private sale, at any time or times thereafter, with the right on the part of such holder to become the purchaser and absolute owner thereof, free of all trusts and claims." In addition when appellees deposited their stock they signed the bank's Collateral Register whereby they agreed to give the bank "the right to sell same in event of default of payment without previous demand, advertisement or notice at public or private sale . . .," etc.

At the trial the pivotal fact was what happened in respect to the collateral on October 19th. In view of the verdict of the jury in plaintiffs' favor, their version of the happening must be taken as verity. The husband testified that shortly after 12 m. of that day he stopped at his automobile parked near his place of work

at the Bethlehem City Hall, and found his daily mail deposited there. He discovered a letter, dated the previous day, from R. R. Strausburg, an official of appellant bank, asking him to call immediately. The letter was misdirected to an address where appellee formerly lived, although the bank knew his correct address. Appellee conferred with Strausburg at the bank about twelve-thirty. Strausburg informed him that the collateral security was declining in value to such an extent that to avoid its sale in discharge of the notes, a considerable sum, from $500 to $1,000, would have to be paid at once. Appellee replied that he could not afford to let the stock be sold and would "go out and get the money," after which he left.

Though plaintiffs had received no previous demand for payment of their obligations or for any additional collateral, the 568 shares of Imperial Oil Company stock had in fact been sold by appellant before the conversation just detailed. It was shown by the testimony of the bank's stock broker that at 11:49 a. m. that day "the order to sell" was received in the New York office; it was "executed on the Board at 11:53 a. m." and "reported back to Bethlehem at 11:56 a. m." The proceeds of the sale were sufficient to pay off the notes, and the balance in cash with the Pure Oil Stock, was returned to appellees. Appellees were not informed of the giving of the order to sell or of the exact time and circumstances of the sale. The market value of the stock which was sold having risen substantially within the two days following October 19th, appellees sued for the difference between its higher value and the proceeds of the sale, and recovered the verdict stated.

The basic legal question in the case is: Was the bank justified in selling the stock without an unresponded-to prior demand on appellees for payment of the demand note or deposit of additional collateral? Appellant does not contend that anything which occurred in connection with the thirty-day note justified a sale, since it had

not matured and was not in default. Its position is, however, that the demand note "matured" immediately on execution and delivery, without any demand for payment or deposit of additional collateral, and being unpaid was in default, which thereupon entitled the holder to sell the collateral securing it.

A pledgee may not dispose of the pledged collateral, by sale or otherwise, in satisfaction of the debt without notifying the pledgor and giving him an opportunity to redeem it by paying off the debt, unless the parties have stipulated otherwise by express contract: *Berberich's Est.*, 257 Pa. 181, 189, 101 A. 461, and cases there cited. What was the contract between the parties in the case at bar? As was said in *Union Trust Co. v. Long*, 309 Pa. 470, 474, 164 A. 346, "the collateral note measures the right of the parties." Here in addition we have to deal with the agreement on the bank's collateral register, which appellees signed. The note gave the bank the right to sell only "upon *default of payment* at maturity . . . without any previous demand, advertisement or notice." The words used in the collateral register were almost identical—"in event of default of payment." It is true, as appellant urges, that a demand note has, in a sense, no maturity, since payment is due immediately on execution and delivery, without any demand: *Appeal of Andress et al., Exrs.*, 99 Pa. 421; *Valiant Co. v. Pleasanton et al.*, 108 Pa. Superior Ct. 197, 164 A. 143. The formality of a demand is unnecessary to authorize the bringing of suit or to begin the running of the statute of limitations: *Aarons v. Public Service B. & L. Assn.*, 318 Pa. 113, 117-118, 178 A. 141. It may be conceded that the demand note, being at all times due and payable, had "matured": *Home Credit Co. v. Preston*, 99 Pa. Superior Ct. 457, 461. It would have been possible for appellees to have agreed that the bank might sell the stock *at any time*, without notifying appellees and without making any demand upon them: see *Colonial Trust Co. v. Central*

*Trust Co., et al.,* 243 Pa. 268, 90 A. 189; *Huntingdon Valley Trust Co. et al. v. Norristown-Penn Trust Co.,* 329 Pa. 356, 196 A. 821. But did appellees so agree? Agreements of pledge are to be strictly construed: *Kelter, Trustee, v. Am. Bankers Finance Co.,* 306 Pa. 483, 493, 160 A. 127: and the construction will be against the party who prepared the agreement; in this case that is the bank: *Heffner v. First Nat'l Bank of Huntingdon,* 311 Pa. 29, 166 A. 370; *New Bethlehem Trust Co. v. Spindler et al.,* 315 Pa. 250, 172 A. 309. What appellees consented to was the sale of their stock on *default* in payment of their note. Though it had "matured" and was due and payable, as above pointed out, it was *not in default,* because no demand, either for payment or for deposit of additional collateral, had been made upon appellees. None of our cases go to the extent of holding that a demand note is *in default* immediately upon execution and delivery, before any demand has been made: see 49 C. J. 983 ("Pledges", secs. 216, 218). Moreover, from the terms of the note itself it is clear that a demand either for payment or for additional collateral was *contemplated* by the parties as essential before conferring on the bank the right of sale. *Otherwise,* it was pointless to define maturity as either expiration of the time for payment *or* failure to deposit additional collateral on demand, since the obligation would at all times be "matured" and the collateral could be sold for this reason irrespective of failure to deposit additional collateral. It is obvious that the collateral agreements, both in the note and in the register, possess a certain ambiguity. Apparently what the bank did was to use a form of agreement appropriate to a time obligation, but *in*appropriate to a demand obligation. To support the bank's position in this case would require an unequivocally expressed consent by appellees that their stock should be sold *without demand or notice of any kind.* The bank produced no proof of such consent.

Reliance is placed by appellant largely upon our decision cited above, in *Colonial Trust Co. v. Central Trust Co. et al.*, but in that case there was both demand for payment and notice of sale. Hence its authority is inapplicable, and any expressions in the opinion relating to the right of sale without demand or notice cannot be controlling here.*

Appellant's further contention that the court below should have declared as a matter of law that appellees ratified the sale by the bank after it took place and hence lost whatever right of action accrued to them thereby, finds no support in the record. A question of ratification does not arise where, as here, no relationship of principal and agent was pleaded or proved. The bank was not appellees' agent. If there was any question of ratification in this case, it was one of fact and the jury's verdict disposed of it.

The judgment is affirmed.

---

* Appellees cite certain other cases from courts of other jurisdictions having a resemblance to the case at bar, but which we deem inapposite on their precise facts: *Milliken v. Dehon Exrx.*, 27 N. Y. 264; *Wilson v. Little et al.*, 2 N. Y. 443; *Genet v. Howland et al.*, 45 Barb. (N. Y.) 560; *Smith et al. v. Shippers Oil Co. et al.*, 120 La. 640, 45 So. 533.